# United States Court of Appeals
## For the First Circuit

No. 12-1349

NUPUR PATEL,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Thompson, Stahl, and Lipez,
Circuit Judges.

Justin Conlon on brief for petitioner.
Laura Halliday Hickein, Trial Attorney, United States
Department of Justice, Office of Immigration Litigation, Stuart F.
Delery, Acting Assistant Attorney General, Civil Division, and
Russell J.E. Verby, Senior Litigation Counsel, Office of
Immigration Litigation, on brief for respondent.

February 1, 2013

**STAHL**, <u>Circuit Judge</u>.  In 2003, petitioner Nupur Patel pled guilty to conspiracy-to-commit-larceny charges stemming from a scheme in which he stole from the dorm rooms of his college classmates.  As a result, an Immigration Judge (IJ) and the Board of Immigration Appeals (BIA) found that Patel, at the time a lawful permanent resident, was removable from the United States because his crimes involved "moral turpitude" within the meaning of the Immigration and Nationality Act (INA).  Patel now seeks our review of that determination.  Because the BIA's ruling does not find adequate support in the record, we reverse.

## I.  Facts & Background

Patel is a twenty-eight-year-old native and citizen of India who became a lawful permanent resident of the United States in 1998.  His parents and only sibling are naturalized U.S. citizens, and many other relatives are either U.S. citizens or permanent residents. After immigrating to the United States, Patel attended high school in Connecticut and then enrolled at the University of Connecticut.  The incident that gave rise to this case occurred near the end of his freshman year.

As recounted by the state prosecutor at Patel's plea hearing, Patel and two acquaintances concocted a plan whereby they would knock on doors in the university's dorms; if the resident answered, they would say they were looking for someone else and leave.  If not, they would enter the room (if the door was

-2-

unlocked) and take things. They executed the plan, taking clothes, DVDs, and electronics, but residents soon noticed the missing items and called the police. University police officers found a car parked outside one of the dorms, in which they could plainly see many of the items that had been reported missing. Patel and his companions returned to the car, admitted their involvement, and were arrested.

Patel was charged with six counts of conspiracy under Conn. Gen. Stat. § 53a-48: three to commit misdemeanor larceny in the fourth degree, id. § 53a-125, and three to commit misdemeanor criminal trespass, id. § 53a-108. He pled guilty, receiving a suspended sentence totaling four-and-a-half years and three years of probation. Patel was also expelled from the University of Connecticut, but continued his education elsewhere, eventually earning a bachelor's and a master's degree. He successfully completed the probation period and has had no other run-ins with the law.

In March 2010, Patel returned to the United States from a vacation abroad. Upon completion of Patel's reentry inspection, the Department of Homeland Security (DHS) issued a Notice to Appear charging him with removability on the ground that his convictions were for "crime[s] involving moral turpitude" (CIMTs) under 8 U.S.C. § 1182(a)(2)(A)(i)(I), and placed him in custody.

-3-

Before the IJ, Patel disputed removability, arguing that his offenses were not CIMTs because a theft offense qualifies as such only if it involves an intent to permanently deprive the owner of her property, and the record of his conviction did not establish that intent. In the alternative, Patel sought a waiver of inadmissibility under 8 U.S.C. § 1182(h). The IJ found Patel removable, explaining that, under her reading of the plea transcript, it was "clear that [Patel] intended to convert these items for his own . . . benefit and permanently deprive" the owners of their use. The IJ also found Patel ineligible for a waiver of inadmissibility because his crimes qualified as aggravated felony theft offenses under 8 U.S.C. § 1101(a)(43)(G).

On appeal, the BIA agreed that Patel was removable and ineligible for a waiver. Patel petitioned for our review, but, at the Government's unopposed request, we instead vacated the decision and remanded to the BIA to consider an argument related to the waiver-of-inadmissibility issue. Patel v. Holder, No. 11-1104 (1st Cir. Sept. 6, 2011) (Judgment). On remand, the BIA again dismissed Patel's appeal. The BIA explained that its CIMT cases do, as Patel contended, distinguish between thefts involving an intent to permanently deprive the owner of the property and those involving only an intent to do so temporarily. Because the Connecticut larceny statute covered both kinds of theft, the BIA applied the modified categorical approach, under which it "look[s] to the

-4-

record of conviction to discern the nature of the respondent's conviction." Based on the prosecutor's description of Patel's crimes at the plea hearing, the BIA concluded that Patel did indeed intend a permanent deprivation of the purloined items. Thus, in the BIA's view, his offenses were CIMTs, and he was removable. The BIA also reiterated its conclusion that Patel was not eligible for a waiver of inadmissibility. Patel now petitions for our review of the BIA's decision.

## II. Analysis

We review de novo the BIA's legal conclusions, Idy v. Holder, 674 F.3d 111, 117 (1st Cir. 2012), including its determination that a non-citizen's criminal conviction is grounds for removal, Campbell v. Holder, 698 F.3d 29, 32 (1st Cir. 2012). Where the Government asserts that a lawful permanent resident returning from abroad has been convicted of a crime rendering him removable, the government must so prove by clear and convincing evidence. See In re Valenzuela-Felix, 26 I. & N. Dec. 53, 54 (BIA 2012); In re Rivens, 25 I. & N. Dec. 623, 625 (BIA 2011). We afford deference to the BIA's reasonable interpretations of the INA, including its construction of the term "moral turpitude," but not to its reading of an underlying criminal statute (as to which it has no expertise). Da Silva Neto v. Holder, 680 F.3d 25, 28 & n.3 (1st Cir. 2012). Where, as here, "the BIA has rendered a decision with its own analysis of the question at issue, our review

focuses on the BIA's decision, not the IJ's." Vásquez v. Holder, 635 F.3d 563, 565 (1st Cir. 2011).

The term "moral turpitude" has a long history in federal immigration law, but Congress has never defined it. See Da Silva Neto, 680 F.3d at 28. Accordingly, we "have adopted the BIA's definition of a CIMT as 'conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general.'" Id. at 29 (quoting Maghsoudi v. INS, 181 F.3d 8, 14 (1st Cir. 1999)); see also In re Silva-Trevino, 24 I. & N. Dec. 687, 689 n.1 (A.G. 2008) (a CIMT "must involve both reprehensible conduct and some degree of scienter"). It is common ground among the parties that theft offenses can meet this definition, and that not all theft offenses do so. As noted above, the BIA generally distinguishes between turpitudinous thefts and their less depraved counterparts by asking whether the defendant intended to permanently deprive the owner of the purloined property. See In re Grazley, 14 I. & N. Dec. 330, 333 (BIA 1973).[1]

---

[1] Pointing to language in another BIA opinion, see In re Jurado-Delgado, 24 I. & N. Dec. 29, 33 (BIA 2006), the Government suggests that "[w]hether the distinction between temporary and permanent takings is a necessary one in the CIMT context remains an open question." In this case, however, the BIA treated the permanent-or-temporary-intent question as dispositive, and our review is limited to the reasoning articulated below. Mihaylov v. Ashcroft, 379 F.3d 15, 21 (1st Cir. 2004); see Wala v. Mukasey, 511 F.3d 102, 106 (2d Cir. 2007) (bypassing this issue where the BIA "treated the [permanent intent] inquiry as determinative").

Here, the parties agree that the Connecticut larceny statute under which Patel was convicted is "divisible," in that it covers both permanent and temporary takings (and thus both turpitudinous and non-turpitudinous conduct).[2] Under the statute, "[a] person commits larceny when, with intent to deprive another of property or to appropriate the same . . . , he wrongfully takes, obtains or withholds such property from an owner." Conn. Gen. Stat. § 53a-119. In turn, "to appropriate" has two meanings: "(A) to exercise control over it . . . [so] as to acquire the major portion of its economic value or benefit"; or "(B) to dispose of the property for the benefit of oneself or a third person." Id. § 53a-118(a)(4). The latter form of appropriation requires that the defendant have acted <u>without</u> the intent to cause a permanent deprivation, <u>Connecticut</u> v. <u>Wieler</u>, 660 A.2d 740, 742 (Conn. 1995), whereas the other prongs of the statute require a permanent intent, <u>see</u> Conn. Gen. Stat. §§ 53a-118(a)(4)(A), 53a-119. Therefore, the question is whether Patel was convicted under subsection 53a-118(a)(4)(B) (in which case his crimes were not CIMTs) or one of the other provisions of the larceny statute, <u>see</u> <u>id.</u> §§ 53a-118(a)(4)(A), 53a-119 (in which case they were).

---

[2]    Although Patel pled guilty to conspiracy to commit larceny rather than larceny itself, the parties agree that larceny is the crime that matters for CIMT purposes. <u>See</u> 8 U.S.C. § 1182(a)(2)(A)(i)(I) (rendering inadmissible an alien convicted of "a crime involving moral turpitude" <u>or</u> "conspiracy to commit such a crime"); <u>cf.</u> <u>Conteh</u> v. <u>Gonzales</u>, 461 F.3d 45, 57 (1st Cir. 2006). For convenience, we refer to Patel's crimes as larcenies.

Because the larceny statute reaches both permanent and temporary takings, the parties concur that we should apply the modified categorical approach, under which "we may look to the record of conviction -- the indictment, plea, verdict, and sentence," Idy, 674 F.3d at 118, to determine which prong of the statute Patel pled guilty to violating. In doing so, we must bear in mind that "the facts underlying the conviction are relevant, if at all, only to identify which crime is the crime of conviction where . . . it is unclear which subsumed offense the defendant pled to." Campbell, 698 F.3d at 33. For example, in Campbell, we applied this methodology to hold that the Government had not shown that the petitioner committed an aggravated felony under the INA, where the smallest applicable subdivision of the statute he pled guilty to violating covered both aggravated and non-aggravated crimes (in that case, both sexual abuse and other types of offenses against children). See 698 F.3d at 33, 35.[3]

Here, the only part of the record of conviction that potentially illuminates this issue is the plea colloquy. At the

---

[3] The modified categorical approach roughly aligns with the middle phase of the three-step CIMT framework prescribed by the Attorney General in Silva-Trevino, 24 I. & N. Dec. 687. Because the parties agree that the modified categorical approach governs here, we need not address the other two Silva-Trevino steps, see Da Silva Neto, 680 F.3d at 29 nn.6-7, nor otherwise wade into the debate about whether this approach is out of place in the CIMT context, compare Prudencio v. Holder, 669 F.3d 472, 484 (4th Cir. 2012), with id. at 491-92 (Shedd, J., dissenting).

plea hearing, the state prosecutor described Patel's offenses this way:

> He had some friends visiting him . . . . In their words they were bored and they were looking for something to do and they came up with a plan where they would go through the dorm[s and] knock on fellow dorm residents' doors. If somebody answered the door, they would say they were looking for a certain individual, close the door and then leave. If nobody answered, they would then open that door, if it was unlocked, go inside and find things that they could take and steal for their own benefit. They did this throughout the many dorms on the . . . campus.

As described by the prosecutor, the items taken included a digital camera, a cellular phone, video game consoles, DVDs, clothing, and a laptop. The presiding judge asked Patel whether the prosecutor's recitation of the facts was accurate, and Patel answered affirmatively, without adding anything to the prosecutor's description.[4]

The parties cross swords over the significance of the particular words the prosecutor chose to describe Patel's scheme: "they would . . . go inside and find things that they could <u>take and steal for their own benefit</u>" (emphasis added). Patel emphasizes the prosecutor's use of the phrase "for their own benefit," which, he points out, mirrors the language of subsection 53a-118(a)(4)(B), the temporary-intent prong of the larceny

_____

[4] The Government is thus incorrect to assert, repeatedly, that Patel "chose to use the term 'steal' during his plea colloquy." He never used that word himself.

statute. See Conn. Gen. Stat. § 53a-118(a)(4)(B) ("[T]o dispose of the property for the benefit of oneself . . . ."). For its part, the Government focuses on the word "steal," asserting, with some support, that "steal" naturally suggests a permanent intent. E.g., Morissette v. United States, 342 U.S. 246, 271 (1952) (defining "steal" to mean "to take away from one in lawful possession without right with the intention to keep wrongfully" (citation and internal quotation mark omitted)); Black's Law Dictionary (9th ed. 2009) (similar).[5]

We think both parties' careful parsing of the prosecutor's language puts more weight on a few isolated words than they can bear. There is no indication that the prosecutor chose his words with the goal of indicating anything about Patel's intent, or with a specific statutory subsection in mind. Indeed, precisely because Patel could be guilty of larceny regardless of whether his intent was temporary or permanent, there was no reason for the prosecutor to consider that issue. Cf. Connecticut v. Spillane, 770 A.2d 898, 907 (Conn. 2001). As far as the record reveals, he was simply explaining, in conversational language, what

---

[5] Patel says that we cannot consider the Government's argument regarding the word "steal" because the BIA did not rely on this rationale below, making the Government's present position an impermissible "post-hoc rationalization." Patel is right that our review is limited to the reasoning articulated by the agency, Mihaylov, 379 F.3d at 21, but we think the BIA may have considered this language, which does appear in its opinion. Regardless, the Government's argument does not carry the day.

Patel and his fellow miscreants did; this description can only tell us so much about what was in Patel's own mind during the crime. Both parties' interpretations of the prosecutor's language are tenable, but we do not believe his choice of words does much to illuminate the issue before us.

Consequently, we turn to the prosecutor's description of "the nature [of] and circumstances surrounding [Patel's] theft offense[s]." In Re Jurado-Delgado, 24 I. & N. Dec. 29, 33 (BIA 2006). The BIA concluded, and the Government argues, that the volume and character of the items taken (mostly expensive electronics), and the fact that a security cable on the laptop was broken, showed Patel's intent to cause a permanent deprivation. Patel rejoins that the BIA's conclusion was based on inferences that are beyond its power to draw when applying the modified categorical approach. In support of this argument, he points to the Second Circuit's decision in Wala v. Mukasey, 511 F.3d 102 (2d Cir. 2007).

In Wala, the petitioner pled guilty to two counts of third-degree burglary under Connecticut law as a result of his entry into, and theft from, the house of a woman he was working for; with two accomplices, he took two rings, other jewelry, a credit card, and two watches. Id. at 103. Because the Connecticut burglary statute criminalizes unlawful entry with the intent to commit a crime, and the intended crime in question was larceny, the

_Wala_ court was called upon to answer essentially the same question presented here: whether the record of conviction established that the petitioner had been convicted under one of the permanent-deprivation prongs of the larceny statute. _See_ _id._ at 107.

Writing for the court, then-Judge Sotomayor answered that question in the negative. She explained:

> In his plea colloquy, . . . Wala "actually admitted" to facts establishing that he was convicted of a burglary with the intent to commit a larceny. Wala did not admit, however, to taking these items with the intent to appropriate them permanently. Wala, moreover, was not charged with committing a permanent taking; the charging document does not specifically name the intended crime associated with his burglary conviction . . . . However improbable, Wala could have been taking the jewelry with the intent to loan it to his girlfriend for one "night on the town" and then return it. Or, he could have been taking the credit cards with the intent to use them for a one-time identification purpose. The point is that either would have been sufficient to sustain Wala's guilty plea and conviction . . . .

_Id._ at 109 (citation omitted). The _Wala_ court's bottom-line conclusion was that, "although it may have been reasonable for the BIA to infer that Wala intended permanently to keep the items he admitted taking, the modified categorical approach does not permit the BIA to draw inferences of this kind." _Id.;_ _accord_ _Akinsade_ v. _Holder_, 678 F.3d 138, 146 (2d Cir. 2012); _cf._ _Renteria-Morales_ v. _Mukasey_, 551 F.3d 1076, 1085 (9th Cir. 2008) (inferences drawn from

-12-

the record of conviction must be "necessary," not merely "reasonable").

Wala's holding was based on the broader principle that "the BIA cannot adjudicate the facts in a criminal case to determine whether, standing alone, they suggest that the petitioner committed a removable offense." 511 F.3d at 109 (citing Sui v. INS, 250 F.3d 105, 119 (2d Cir. 2001)). Our cases likewise emphasize that, "as a general rule, 'the BIA may not adjudicate guilt' and 'must base removal orders on convictions, not on conduct alone.'" Campbell, 698 F.3d at 32 (quoting Conteh, 461 F.3d at 56). And we agree with the Wala court's application of this principle. As in Wala, there may be some reason to think that Patel intended to cause a permanent deprivation, but the facts revealed by the plea colloquy are not sufficient to "identify which crime" -- subsection 53a-118(a)(4)(B), or another prong of the larceny statute -- "is the crime of conviction." Campbell, 698 F.3d at 33 (emphasis omitted). It is true that, as the Government points out, Wala's plea colloquy used the word "took" whereas Patel's used the word "steal," but, for the reasons given above, we do not see this as a dispositive distinction (and there is no indication that the Wala court considered the use of "took" to be decisive). And we do not think it any more "improbable" that Patel was engaged in a foolish collegiate prank than that Wala took "the jewelry with the intent to loan it to his girlfriend." Wala, 511

-13-

F.3d at 109.[6] Ultimately, although the inferences drawn by the BIA here are not unreasonable, they impermissibly bridge the "gap between the 'offense' and the actual conduct" involved, Campbell, 698 F.3d at 35, because "there is no statement in [Patel]'s plea colloquy admitting an intent to commit a permanent taking," Wala, 511 F.3d at 110; see Akinsade, 678 F.3d at 144 ("[T]he BIA may only consider facts to which a defendant actually and necessarily pleaded in order to establish the elements of the offense . . . ." (citation and internal quotation mark omitted)).  Consequently, we hold that the BIA erred in finding Patel removable, and need not decide whether he would be eligible for a waiver.

This result may seem strange, but that is a not-uncommon side effect of the modified categorical approach.  "Sometimes th[is approach] hurts the alien . . . .  Other times, as in this case, the alien . . . comes out ahead. This is hardly the most jarring example."  Campbell, 698 F.3d at 36.

### III.  Conclusion

For the foregoing reasons, Patel's petition for review is granted, the BIA's order dismissing Patel's appeal is vacated, and the matter is remanded to the BIA for further proceedings consistent with this decision.

---

[6]      We do not agree with the BIA that the fact that an item was damaged necessarily places this escapade beyond the realm of the prank.  Cf. Rodriguez-Herrera v. INS, 52 F.3d 238, 240 (9th Cir. 1995) (conviction under property-damage law that reached "pranksters with poor judgment" was not categorically a CIMT).

-14-